UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE A. RODRIGUEZ,

        Plaintiff,

   v.

O'HARA,

        Defendant.

Case No. 14-cv-05646-HSG

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 18

## INTRODUCTION

Plaintiff, a California prisoner currently incarcerated at Solano County Jail, filed this *pro se* civil rights action under 42 U.S.C. § 1983 regarding events that took place at West Contra Costa County Detention Facility ("WCDF"), where he was previously incarcerated. The Court found that, liberally construed, the complaint stated a cognizable claim that WCDF Deputy O'Hara violated his constitutional rights by using excessive force against him. *See* Docket No. 10 at 2. Now before the Court is Defendant's motion for summary judgment. *See* Docket No. 18. Plaintiff, despite having advised on at least two occasions of the summary judgment requirements pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998), has filed no response to Defendant's motion, and the deadline to do so has long since passed. Defendant's motion for summary judgment is now ripe for review.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

Plaintiff was arrested on May 27, 2014, and booked into the Martinez Detention Facility. *See* Docket No. 18 ("MSJ") at 7. From May 27, 2014 to September 30, 2014, Plaintiff was incarcerated at WCDF. At the time of the relevant incident, Plaintiff was a post-arraignment, pre-

trial detainee.

On July 10, 2014, Deputy O'Hara arrived at WCDF, Building 5, around 3:30 p.m. to assist with monitoring afternoon free time. Docket No. 23 ("O'Hara Decl.") ¶ 3. Around 5 p.m., another deputy informed Deputy O'Hara of tension between Building 5 inmates. *Id.* Sergeant Chestnut was also informed of this tension. Docket No. 21 ("Chestnut Decl.") ¶ 3. Deputy O'Hara requested and received authorization from WCDF Sergeant Lucky Chestnut to carry a pepperball gun as a precautionary measure. O'Hara Decl. ¶ 3 and Chestnut Decl. ¶ 3. A pepperball gun is a paintball gun that contains a small ball filled with pepper spray powder. It is generally 24 to 36 inches long and is carried with a sling across the body. O'Hara Decl. ¶ 3. It is commonly utilized, if necessary, to deter organized gatherings or hostile situations. Chestnut Decl. ¶ 3.

Deputy O'Hara picked up the gun from Sergeant Chestnut's office prior to the start of the evening free time that night, which started around 7:00 p.m. O'Hara Decl. ¶ 4. While monitoring the evening free time on Building 5, another deputy alerted Deputy O'Hara to some suspicious activity on module 5A.[1] *Id.* Deputy O'Hara decided to disengage the safety on the pepperball gun and left it disengaged as he walked Building 5, looking for suspicious activity. *Id.* Deputy O'Hara was wearing the pepperball gun on a sling across his body, from left to right. *Id.* He was also wearing a duty belt, which had a magazine and key holder attached. *Id.* Deputy O'Hara noticed that several inmates had gathered on the upper tier of module 5A. *Id.*

The parties disagree as to the events that follow.

According to Plaintiff, he was having a conversation on the stairs with another inmate as Deputy O'Hara walked past. Docket No. 1 ("Compl.") at 3. Plaintiff described Deputy O'Hara as seeming upset and carrying a rubber bullet gun. *Id.* As Deputy O'Hara approached Plaintiff, Plaintiff turned his back to Deputy O'Hara so that Deputy O'Hara could ascend the stairs. *Id.* Plaintiff heard a shot go off and felt instant pain on the back of his left leg. *Id.* Plaintiff concluded that Deputy O'Hara had shot him for no reason. *Id.* Deputy O'Hara asked Plaintiff if the bullet

---

[1] Building 5 is split into two modules, 5A and 5B, each side having a bottom and upper tier. O'Hara Decl. ¶ 3.

1  had hit Plaintiff. *Id.* Plaintiff responded that it had. *Id.* Deputy O'Hara did not reply and simply
2  walked away. *Id.* The rubber bullet released a powder that caused the inmates to cough and
3  choke. *Id.* None of the WCDF staff asked the inmates if they needed any medical assistance. *Id.*
4  According to Deputy O'Hara, as he walked up the stairs, he accidentally discharged his
5  pepperball gun. O'Hara Decl. ¶ 4. Since Deputy O'Hara did not have his finger on the trigger, he
6  assumes that the trigger caught on his magazine or keyholder and caused the accidental discharge.
7  *Id.* Because of the way the gun was pointed down, the way the pepperball hit the step next to his
8  left foot, and the way the powder formed on the step, Deputy O'Hara was certain that the
9  pepperball had been shot straight down and had not hit any inmates. *Id.* ¶ 5. Deputy O'Hara
10 checked the immediate area and saw Plaintiff approximately two steps below him. *Id.* Deputy
11 O'Hara asked Plaintiff if he was okay; Plaintiff said yes. *Id.* Deputy O'Hara asked if Plaintiff
12 was sure, and Plaintiff again said yes. *Id.* Deputy O'Hara continued upstairs to check on the
13 inmates gathered on the second tier. *Id.* These inmates seemed unaffected by the powder. *Id.*
14 After approximately 30 seconds, Deputy O'Hara heard inmates cough, so Deputy O'Hara went
15 downstairs to activate the purge fans. *Id.* The fans dissipated the fumes and Deputy O'Hara did
16 not observe any continuing adverse reactions to the pepperball powder. *Id.* Deputy O'Hara spoke
17 again with Plaintiff briefly after the fans had been activated. *Id.* ¶ 6. Deputy O'Hara asked
18 Plaintiff if he was okay and if he had been hit by the pepperball. *Id.* Plaintiff said that he was
19 okay. *Id.* Plaintiff did not mention being hit or injured by the pepperball, nor did he mention
20 being in need of medical attention. *Id.*
21  Deputy Hughes heard the pepperball gun discharge and went over to see what happened.
22 Docket No. 26 ("Hughes Decl.") ¶ 3. Deputy O'Hara told Deputy Hughes that the gun had caught
23 on something on his duty belt and accidentally discharged. *Id.* Some of the inmates told Deputy
24 Hughes that the pepperball hit the stairs. *Id.* None of the inmates reported being injured. *Id.* ¶ 4.
25 Deputy Hughes saw a module worker using a mop to clean up the powder on the stairs. *Id.*
26  At approximately 8 p.m., Deputy O'Hara called Sergeant Chestnut to report the accidental
27 discharge of the pepperball gun. O'Hara Decl. ¶ 7 and Chestnut Decl. ¶ 4. Deputy O'Hara
28 reported that the gun had caught on something on his duty belt and discharged as he was going up

United States District Court
Northern District of California

3

the stairs. Chestnut Decl. ¶ 4. Deputy O'Hara reported that he did not believe he had hit any inmates. *Id.*

The parties agree that the following day, Plaintiff submitted an inmate grievance to Sheriff Griffieth. Plaintiff told Sheriff Griffieth that he was seeking medical care for an incident that had occurred the day prior, July 10, 2014. Docket No. 25 ("Griffieth Decl.") ¶ 3. The grievance was address to medical and stated as follows:

> Medical. I was accidently shot by one of the deputys "Ohera" on 7-10-2014 in Mod 5A at night. During the time, I was hit in the right leg is bruised and it hurts. I would like to get seen please.

Plaintiff listed five witnesses. Chestnut Decl. ¶ 4 and Ex. D.

Sergeant Chestnut conducted a preliminary investigation into the incident. Because the grievance form described the incident as an accident and requested medical attention, Sergeant Chestnut's investigation did not focus on whether Deputy O'Hara had used force without cause. Chestnut Decl. ¶ 7. He interviewed the five witnesses listed by Plaintiff on the inmate grievance form. *Id.* ¶ 8. Sergeant Chestnut also interviewed Plaintiff. *Id.* According to Sergeant Chestnut, Plaintiff described the incident as follows: "He said that Deputy O'Hara was walking by him, just going up the stairs, when the gun he was carrying went off." *Id.* Plaintiff stated that he was treated with a bandage for injury to the outside of his left leg. *Id.* He acknowledged that his inmate grievance incorrectly identified his right leg as the injured leg. *Id.* When asked if he needed further medical attention, Plaintiff said no. *Id.* Based on his investigation, Sergeant Chestnut concluded that the pepperball discharge was accidental. *Id.*

On July 12, 2014, Plaintiff was seen by a registered nurse. Docket No. 22 ("Sohn Decl."), Ex. E. The medical notes for the visit indicate that Plaintiff's lower left leg had two tiny open wounds with some redness around the area. *Id.* Plaintiff was given a cold pack to decrease the redness; the wound was cleaned and dried and Bactrim ointment and a band-aid was applied. *Id.* The nurse reported that Plaintiff stated that he had been accidentally hurt by a rubber bullet. *Id.*

During Plaintiff's incarceration at WCDF, he submitted requests for library materials and visitation requests, as well as the aforementioned July 11, 2014 grievance seeking medical

4

attention.  Docket No. 24 ("Bonthron Decl.") ¶ 4.  There is no record of a grievance in Plaintiff's booking file alleging force being used without cause.  *Id.*  Outside of the request for medical attention, there are no grievances related to the July 10, 2014 pepperball gun discharge.  *Id.*

**DISCUSSION**

**I.     Standard of Review**

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Id.* at 33.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *See id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A verified complaint may be used as an opposing affidavit under Rule 56, provided it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10–11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated, under penalty of perjury, contents were true and correct, and allegations were not based purely on information and belief but rather on personal knowledge). Here, Plaintiff's verified complaint is considered in opposition to the motion for summary judgment.

The failure to exhaust administrative remedies is an affirmative defense that must now be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). In bringing such a motion, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If the defendant carries that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with the defendant, however. *Id.* "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.* at 1166.

## II. Analysis

Defendant argues that he is entitled to summary judgment because Plaintiff has failed to exhaust all available administrative remedies for his excessive force claim. Defendant also argues that there is no triable issue of fact supporting an excessive force claim, and that he is entitled to qualified immunity. Because the Court finds that Plaintiff has failed to exhaust his administrative remedies, the Court declines to reach Defendant's remaining arguments.

The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Although previously within the discretion of the district court, exhaustion in prisoner cases

covered by § 1997e(a) is now mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Exhaustion is a prerequisite to all inmate lawsuits pertaining to prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. *Id*. at 532.

The PLRA exhaustion requirement requires "proper exhaustion" of all available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91 (footnote omitted). Whether an inmate's grievance satisfies the PLRA's exhaustion requirement is determined by the prison's own grievance process. *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

The exhaustion requirement of the PLRA is intended to serve a number of purposes, including providing an opportunity for corrections officials to address complaints internally, deterring frivolous lawsuits, and creating an administrative record allowing courts to evaluate the relative merits of claims. *See Porter*, 534 U.S. at 525. The purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation. *Griffin*, 557 F.3d at 1120. The grievance should include sufficient information "to allow prison officials to take appropriate responsive measures." *Id.* (citation and internal quotation omitted). The grievance need not include legal terminology or legal theories unless they are needed to provide notice of the harm being grieved. *Id.* Nor must a grievance include every fact necessary to prove each element of an eventual legal claim. *Id.* Where a prison's grievance procedures do not specify the requisite level of factual specificity required in the grievance, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" *Id*. (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).

The Court next turns to the administrative remedies available to prisoners incarcerated at WCDF. WCDF is one of the detention facilities operated by the Office of the Sheriff-Coroner of Contra Costa County, Custody Service Bureau ("CSB"). Docket No. 20 ("Andrews Decl.") ¶ 3. The CSB has provided its inmates with a grievance procedure "to resolve disputes and receive a

7

written response in a timely manner without fear or reprisal or punitive action." Andrews Decl., Ex. A. Grievance procedures apply to questions concerning conditions of confinement. *Id.* All WCDF inmates are informed of the CSB's grievance procedures via an orientation video that they are required to watch during the booking process. *Id.* ¶ 8.

The grievance procedures require that an inmate first attempt to resolve the grievance informally. Andrews Decl., Ex. A. If unsuccessful, the formal grievance must be submitted on an inmate request form to a deputy within 48 hours of the date of the incident or condition. *Id.* The deputy receiving the grievance must attempt to resolve the grievance prior to routing. *Id.* If there is no resolution of the issue, the grievance is routed "to the most appropriate authority capable of resolving the grievance." *Id.* The staff member receiving the grievance must provide a written response stating the "final" disposition of the grievance, and place a copy of the grievance into the inmate's booking file. *Id.* If the inmate is dissatisfied with this first level response, he must submit an appeal on an inmate request form to the Facility Commander within three days of the grievance disposition. *Id.*, Exs. A and B. The Facility Commander must provide a written response within 10 days. *Id.*, Ex. B. The inmate has "the right to appeal previous decisions until they have been satisfied or the detention division chain of command has been exhausted. Consecutive appeals for the same incident should be routed to the Division Captain for final review." *Id.* Copies of the appeals and results are placed in the inmate's booking file. *Id.*

The same inmate request form is used for submitting grievances, as well as for making requests for services, such as legal materials, custody status, medical triage requests, etc. Andrews Decl., Ex. C and Bonthron Decl. ¶ 4.

Defendant contends that Plaintiff has failed to exhaust administrative remedies for his excessive force claim. Defendant argues that Plaintiff's grievance submitted on July 11, 2014, does not mention excessive force, but instead seeks medical attention and states that Deputy O'Hara accidentally injured him. Defendant further notes that Plaintiff's booking file contains no grievances complaining of excessive force.

The Court finds that Defendant has met his initial burden of proving "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy."

8

*Albino*, 747 F.3d at 1172. WCDF provides an administrative remedy, which is set forth in the CSB Policy and Procedures sections titled "Inmate Grievance Procedures" and "Inmate Appeals Process." Andrews Decl., Exs. A and B. Inmates are informed of this administrative remedy during the booking process and can ask WCDF staff members for more information or for copies of the CSB Policy and Procedures. *Id.* ¶¶ 7, 8.

The record supports Defendant's contention that Plaintiff's July 11, 2014 grievance failed to exhaust this administrative remedy with respect to a claim of excessive force.

First, even liberally construed, Plaintiff's July 11, 2014 grievance does not have the same subject and same request for relief as his complaint in this instant action. A claim of excessive force is evaluated by applying the "unnecessary and wanton infliction of pain" standard, as set forth in *Whitley v. Albers*, 475 U.S. 312 (1986). The core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992); *Whitley*, 475 U.S. at 320–21. Mere negligence does not rise to the level of a constitutional violation. *See Farmer v. Brennan*, 511 U.S. 825, 835–37 (1994). Plaintiff's July 11, 2014 grievance specifies that his request is "medical" and characterizes Deputy O'Hara's actions as accidental. Chestnut Decl., Ex. D. Plaintiff's grievance concludes by seeking medical attention. *Id.* This request did not alert WCDF to an excessive force issue, *e.g.*, that Deputy O'Hara had maliciously and sadistically caused Plaintiff harm. Because the grievance was framed as a medical issue, it was understandably treated solely as a request for medical assistance. The instant complaint, on the other hand, claims that Deputy O'Hara used force on Plaintiff without justification, seeks to hold Deputy O'Hara accountable for his discharge of the pepperball gun, and seeks compensation for Plaintiff's injuries. The July 11, 2014 grievance does not exhaust Plaintiff's administrative remedies. *See*, *e.g.*, *Morton v. Hall*, 599 F.3d 942, 946 (9th Cir. 2010) (grievance that complained of visitation restrictions, and did not mention an assault or theorize that the visitation restriction imposed was related to the assault, was insufficient to put prison officials on notice that staff conduct contributed to the assault).

Second, even assuming arguendo that Plaintiff's July 11, 2014 grievance had the same

9

subject matter and same request for relief as the complaint in the instant action, Plaintiff failed to pursue all available remedies. Compliance with prison grievance procedures is required by the PLRA to "properly exhaust." *Jones v. Bock*, 549 U.S. 199, 217–18 (2007). Here, WCDF provided for additional remedies, specifically an appeals process.[2] Andrews Decl., Ex. B. Plaintiff did not appeal his grievance through the appeals process,[3] and therefore failed to exhaust his available administrative remedies. *See Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005) (obligation to exhaust persists so long as some remedy is available).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Docket No. 17) is GRANTED.

The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated:  1/5/2016

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[2] The language used in the CSB Policy and Procedures is confusing. The Inmate Grievance Procedures section refers to the first level response as a "final disposition of the grievance." Andrews Decl., Ex. A ¶ 6. But, two paragraphs later, it states: "If the inmate is dissatisfied with the level one, line supervisor/first response disposition, the inmate may appeal within (3) days," *id.*, indicating that the first level response is not a "final" disposition of the grievance. However, there is no indication that Plaintiff was confused by the "final disposition" language. It is Plaintiff's burden to come forward with evidence that something in his particular case made the existing and generally available administrative remedies unavailable to him. *Albino*, 747 F.3d at 1172.

[3] Defendant correctly notes that any complaint filed by Plaintiff with the City of Richmond would be irrelevant to, and insufficient to meet, the PLRA's exhaustion requirement. The PLRA exhaustion requirement "requires a prisoner to exhaust the prison's internal grievance process." *O'Guinn v. Lovelock Correctional Center*, 502 F.3d 1056, 1062 (9th Cir. 2007).